WARREN AKIN, plaintiff in error, vs. JOHN R. FREEMAN, defendant in error.

1. The eighth and twenty-ninth sections of the Act of 1856, prescribing that after seven years without an entry, etc., a judgment shall not be enforced, but shall be presumed to be satisfied, and also that where a *bona fide* purchaser has been in the possession of real property four

Akin *vs.* Freeman.

years, it shall be discharged of the lien of any judgment against the person from whom he purchased, were parts of a statute of limitation in force on the 30th of November, 1860, and were by the terms, spirit and intention of the Act of that date suspended ; and by the various Acts from 1860 to 1865, the suspension was continued until the close of the war.

2. Shorter sold land to Rice, against whom there was a judgment, and gave Rice a bond for title. Rice, without paying any of the purchase money, sold to Freeman, agreeing to transfer Shorter's bond, but not having it at the time, gave Freeman his own bond. This was in 1860. Freeman at once paid a portion of the purchase money to Rice and went into possession. A short time afterwards, Freeman paid a sufficient amount to pay Shorter, which was done with the money so advanced, leaving a portion still unpaid to Rice. Freman subsequently, in 1862, forwarded this to Rice, who, by express, sent his own deed to Freeman. Freeman demanded the bond of Shorter, and Rice replied that he had given him that before. Nothing more was done until 1867, when the judgment creditor levied on the land as Rice's property, and after this levy, Freeman obtained Shorter's deed without warranty :

*Held,* That no title ever vested in Rice which was the subject of levy and sale.

WARNER, Chief Justice, dissented.

Statute of limitations. Judgment. Execution. Bond for titles. Before Judge HARVEY. Floyd Superior Court. January Term, 1872.

On November 22d, 1858, Akin recovered a judgment in Cass Superior Court against the Cherokee Baptist College, as principal, and John H. Rice, as indorser, for $1,000 00 principal, besides interests and costs. Execution was issued on this judgment on December 6th, 1858, upon which were the following entries : A receipt, signed by the clerk, for $9 25 costs, dated July 26th, 1859 ; a receipt from plaintiff to the defendant for $156 75, interest due thereon, dated December 22, 1859; an affidavit by the plaintiff that Rice had removed from, and then resided out of the limits of the State of Georgia, dated May 11th, 1867 ; a levy upon a lot of land situate in the city of Rome, dated May 31st, 1867. The property levied on was claimed by John R. Freeman. The evidence upon the issue thus formed made the following case :

In the fall of 1858 Rice bought the property in dispute

Akin *vs.* Freeman.

from Alfred Shorter, taking a bond for titles, but paying no portion of the purchase money. About March 1st, 1860, Rice sold the lot to Freeman, but not having Shorter's bond at hand, executed his own bond, receiving at that time $1,000 00 in money. Freeman went into possession, and a short time thereafter made another payment to Rice, out of which the entire balance due to Shorter was paid. In 1862, Freeman sent the balance due to Rice to him, and he immediately forwarded to Freeman his deed, dated March 4th, 1862. Freeman demanded Shorter's bond for title; Rice replied that he had before that time delivered it to him. Freeman knew of no judgment or lien against the land until January, 1867. On the 9th of January, 1869, he procured a deed from Shorter, without warranty.

The jury found the property not subject. Whereupon, the plaintiff in execution moved for a new trial upon the following grounds, to-wit:

1st. Because the Court erred in the following charge to the jury: "If seven years had run against this *fi. fa.* without proper entries during that time, it would be dormant and could not bind the land."

2d. Because the Court erred in the following charge: "If Freeman was a *bona fide* purchaser for value, without actual notice of this judgment, and held possession of this land for four years prior to the levy, the land in his hands is discharged from the lien of the judgment, even if it is not dormant."

The motion was overruled, and plaintiff excepted.

WARREN AKIN; ALEXANDER & WRIGHT, for plaintiff in error.

SMITH & BRANHAM, for defendant.

TRIPPE, Judge.

The question, whether the different Acts suspending the statutes of limitation operated to suspend the statutory provisions in reference to judgments becoming *satisfied* or dor-

mant, by having no entry upon them within seven years, or having their lien discharged, so far as relates to property sold by the defendant, when the purchaser has been in possession of land so sold for four years, has been for several years exhaustively argued before this Court, and in the decisions heretofore made. I do not propose to be prolix, or to wrong the professional reader, in giving the reasons for my concurrence in the judgment pronounced on these points at this term.

There is not a more universally fixed' and accepted rule than that, in the construction of statutes, the intention of the Legislature, when discovered, shall prevail. The ninth clause of the fourth section of the Code, in enacting rules for the construction of statutes, says: "In all interpretations the Courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil and the remedy:" See 2 Cranch, 33; *Ibid.*, 386; 1 Black's Reports, 61; 4 Dallas, 14.

Keeping this principle in view, let us look into the first Act, passed November 30th, 1860, touching the question of suspension. The fourth section says:. "It shall not be lawful for any plaintiff in *fi. fa.*, his agent or attorney, to have the same levied upon the property of any inhabitant or corporation of this State, until the first of December, 1861;" and after making several provisions to suspend sales in cases of levies then pending, and allowing levies where defendants were removing, etc., it provides that the statutes of limitation shall cease to run, etc., during a certain period, to-wit: the suspension of the banks. It will be observed that the restraining provisions of this Act applies exclusively to the enforcement of judgments by levy, and placed no barrier or prohibition whatever against bringing suits or actions by creditors or plaintiffs.

What reason could there be to enact a law preventing executions from being levied, which would become dormant if an entry were not made upon them within seven years by the officer authorized to execute and return the same, and to make no provision against such a result, but to provide simply that

Akin *vs.* Freeman.

there should be a suspension of any Act of limitation upon the *right of a creditor to sue?* There was nothing in the Act affecting the right to bring an action—nothing denying that; and a creditor with a claim not in judgment was in no way touched by the Act. The judgment creditor was barred from levying, and thereby made to lose or risk his debt for his failure so to do, unless some relief was granted against the other law on the statute book, thus endangering his right. One class of creditors, not within the scope of the Act or in danger of being hurt by it, would thus have all *bars*—all limitations against them removed, whilst the other class, who had new disabilities imposed upon them, would be denied, not only the benefit or relief granted to the first, but forced, seriously if not fatally, to hazard their right of final collection by submission to the law itself. If the creditor could have managed to have had an "entry" made, so as to prevent his becoming disabled to enforce his judgment at all, under the eighth section of the Act of 1856, then in force, I have never been able to see by what means he could preserve his lien on land sold by his debtor, provided the Act continued for four years, and the purchaser remained in possession during that time. The Act was, in fact, by repeated legislation, continued in force for more than four years; and if the twenty-ninth section of the Act of 1856 was not suspended, then we would have had the spectacle of a Legislature forbidding a creditor to move in the collection of his debt, and, at the same time, keeping in operation a law whereby he should lose his lien on whatever real property his debtor might sell. Such a construction would not only make the Legislature, in inserting the suspending clause in the Act of November 30th, 1860, guilty of a foolish discrimination in favor of those who had no need of it, but also guilty of a great wrong and outrage against those to whom the relief was denied, and who were the only persons who were legislated into a position to demand it. Reason and a sense of justice would require a Legislature, whenever it suspended the power of a citizen to assert his rights, also, at the same time, to suspend any and every law

that imposed disabilities upon him for his failure to assert them; and Courts would be quick to construe in his behalf any words in such enactments, that, by any reasonable fairness, could admit of a construction that would prevent such gross injustice.

In this view could it be called a violation of any fair rule of construction, to say that the Legislature intends to, and did, by this clause of the Act of 1860, suspend the eighth and twenty-ninth sections of the Act of March, 1856, even if the eighth section had been simply a provision as to judgments becoming dormant, and not a statute of limitation as it was held to be in *Chambliss vs. Phelps*, 39 *Georgia*, 386; *Battle vs. Shivers, Ibid.*, 405 ; *Horton vs. Clarke*, 40 *Georgia*, 412 ?

Such Acts as the Dormant Judgment Act of 1822–3, have been called by the Courts and the Legislature, Acts of limitation. In 7 *Georgia*, 166, this Court, in giving a construction to that Act, said: "We are of opinion that there is nothing to prevent the Legislature from *fixing a time within which an existing judgment shall be enforced*, as well as to pass any other *Act of limitation*." Words of a similar import were used in 2 *Kelly*, 255, in reference to the same Act of 1822. So in Charlton's Reports, 330, 331; and there are several other instances where Courts have so denominated such Acts. The Legislature in the third section of the Act of 1866, commonly known as the "stay law," in referring to the laws in relation to *limiting liens*, expressly call them "statutes of limitation." If, then, these words have been so often used by the Courts in that sense, and by the Legislature in the series of Acts on the same subject, have been in terms so directly applied, and the spirit and justice of this Act of 1860 so strongly call for a construction of the same words therein used, in order to prevent great wrong and injustice, and I may say to protect the Legislature itself against a gross absurdity in the meaning of its enactments, we are furnished with sufficient, if not overwhelming reason, whilst looking for the intention of the law-maker in passing the Act of 1860, and "keeping in view the old law, the evil and the remedy,"

Akin *vs.* Freeman.

to hold that where the Act in one clause prevented a judgment from being enforced, and in the next clause suspended the "Acts of limitation," it meant to suspend any and all Acts which imposed penalties, forfeitures, losses or any hurt or damage whatever that might otherwise result from obedience to that Act. I will add that, in my individual opinion, no one for a long time entertained a doubt as to this being the proper meaning of that Act, and that the universal opinion of lawyer and layman was that, under its provisions, no judgment creditor ran any risk of losing his lien, or of his judgment becoming barred or dormant.

I have referred to the words used in the Act of 1866, styling these Acts "statutes of limitations," for the purpose of showing how these have been applied by the Legislature, as well as by the Courts. It is denied that these Acts were suspended by the Act of 1866, because as it only suspended "all statutes of limitation, relating to the liens affected by the Act," and as the whole "stay law" feature of it was declared unconstitutional, therefore no lien was *affected* by it, and consequently no statute was suspended. Be that as it may, the force of the reference is just as strong. The Legislature may not have the power to enact a stay law, but yet, the sense in which it used the words "statutes of limitations," is as clear as it would have been had the Act been declared in its main provisions valid. It may be, also, pertinent to add, that although the portion of the Act of 1866 preventing liens, etc., may have been unconstitutional under the principle of the decision in the case involving the Act of 1866, yet the suspension clause in it was independent of the stay law feature, and had no words limiting or confining its meaning to, or making it contingent on other portions of the Act, which were of no effect. The Legislature intended to prevent executions from being levied, and it said so in plain unmistakable terms. It of course thought the Act constitutional, and that it would be enforced. Its enforcement without further provisions, would have worked wrong to judgment creditors. To prevent this, the Legislature inserted an independent clause, sus-

pending the statutes of limitations. The intention of the Legislature in this last provision is as plain as if no constitutional question could arise as to the former part of the Act. Moreover the people, the subjects of the law, almost with one accord, accepted the Act, the whole Act, with all its parts, and submitted to it, believing that whether it was or was not constitutional, its observance would not work a denial of all rights, for there was a saving clause protecting them against injury from lapse of time. And thus the whole force of the reason of the rule as to the intention of the Legislature, the spirit and reason of the statute, "the old law, the evil, and the remedy," remains practically unimpaired.

I have referred to the decisions in 39 *Georgia*, 386, 405, and 40 *Georgia*, 412, where it was held that the eighth section of the Act of 1856 was a statute of limitation, and was suspended by the Act of 1860, and the suspension continued by the subsequent suspension Acts. It is there said that the suspension of this section operates to revive the next preceding Act which regulated the subject, to-wit: the Act of 1822-3. I have already said, in substance, that had the eighth section of the Act of 1856 been in the terms of the Act thus said to be revived, it would none the less have been suspended by the Act of 1860 and similar subsequent Acts. It would have been but a poor boon to have barred the creditor of his right to levy, and to have told him that, in the meantime, he should be compensated by being relieved from the statute which would hold his judgment paid and satisfied, and substituting therefor another statute which would only make it dormant— that a fatal poison should not be administered which would produce death to the debt, but only an opiate to effect a sleep which would kill its lien. Such could not have been the intention of the Legislature.

If the suspending clause in the Act of 1860 had such an effect, then, as the Act of 1856, known as Cone's Act, was a codifying Act of all the statutes of limitation, and, in some instances, changed the rule as to time, and was in force on the 30th of November, 1860, would not its suspension have revived

the preceding statute of limitation, and thus there would never have been any suspension whatever, at least, by virtue of the Act of 1860, and the subsequent Acts continuing it in force? On the 14th of December, 1861, a general Act was passed suspending "the statutes of limitations then (now) in force during the war." This was independent of the Act re-enacting the one of 1860.

Upon the view of the whole question, considering the situation of the people at the time, the policy of the Legislature as indicated by these statutes, the special provisions and working of the Acts, and their actual effects upon debtor and creditor, it was clearly intended that, in the midst of threatened and actual war and revolution, debtors should not only not be harassed by levies and sales of their property, but that creditors should in no way suffer deprivation or loss beyond the postponement of their right for the immediate enforcement of their claims.

The Act of 1860 was, by several subsequent Acts, continued in force until the end of the war, and the levy having been made in 1867, the judgment cannot "be held and taken as fully satisfied and paid," or dormant, or that four years' possession of land by a purchaser during that time discharged it of the lien of such judgment.

But the next question is, did the lien of the judgment ever attach to this land? Did Rice, the defendant, ever have any interest in the land that could be levied on? He bought two parcels of land, one from Shorter and one from Alexander, taking bond for titles without paying any purchase money. There was, thus far, certainly no interest in Rice, subject to levy and sale. Whilst in this situation he sold both parcels to Freeman. The land bought from Shorter is the property levied on. Rice states in his testimony that he transferred Shorter's bond for titles to Freeman. Freeman says it was the contract that he was to do so, but not having the bond of Shorter's at the time, Rice's own bond was given as a temporary arrangement. Freeman paid Rice a portion of the purchase money, and afterwards enough to pay off the whole

purchase money due Shorter, which was done.  When Shorter was thus paid and the right existed as against him to demand a deed, Rice neither held the land under bond for titles, nor was he in possession of the land, nor did he hold a bond for titles, for Freeman had the right to that, and the right to a deed from Shorter.  Any equity that accrued by virtue of the payment to Shorter, accrued to Freeman, and previous to the contract between Rice and Freeman, Rice only had a naked equity which was never the subject of levy and sale. Whatever further equity arose as against Shorter or in favor of any one, was on account of the payment with Freeman's money and vested in him.

It is true, a judgment is a lien on all the property of a defendant.  But it has never been held that it can be enforced by a levy and sale of land held under a bond for titles, where none of the purchase money is paid.  If the purchaser thus holding has paid all the purchase money, then he has a perfect equity liable as property to which he has a legal title.  The 3528th section of the Code provides, that "where a person holds property under a bond for titles and the purchase money has been partially paid, the same may be levied on under judgments against such persons, and the entire interest stipulated in the bond shall be sold."  It then proceeds to provide for the protection of the vendor as to his claim for the unpaid purchase money.  But in this case, as already stated, when the purchase money was paid to Shorter, Rice was not a holder of the property or bond for titles in any legal or equitable sense.  In the case of *Ware vs. Jackson*, 19 *Georgia*, 452, the facts were, that in January, 1845, Baker sold to Iverson and gave bond for titles on the payment of the purchase money. In November, 1846, Ware recovered judgment against Baker. In March, 1848, Baker made a deed to Iverson, having received the purchase money.  Iverson afterwards sold to Jackson.  Ware levied his judgment, and Jackson interposed a claim.  The Court below held the land was *not subject,* whilst a majority of this Court reversed the judgment of the Court below, and held on strictly legal grounds that the land was

Akin *vs.* Freeman.

subject.  Yet Judge LUMPKIN concurred with "doubt and misgiving," and Judge BENNING dissented, concurring with the Court below, that the lien of the judgment never attached to the land.  In that case there was the legal title in the defendant in judgment, when it was obtained, and the purchase money not paid, and yet the Judge below who tried the case did not think the land was subject—one Judge of this Court concurring with him, and another hesitatingly deciding to the contrary.  I refer to this case mainly for the purpose of calling attention to the position taken in the decision, and the force that was given in the argument to the rule that equity looked upon things agreed to be done as actually performed, and to make an application of that principle to the contract between Rice and Freeman at the time it was made, that Freeman was to have the bond of Shorter.  But I will leave the further discussion of this point to my brother McCAY, who concurs with me on this branch of the case.  I cannot see, if this case were sent back, how the verdict could be contrary to what it is, although the Court below erred on the other questions involved, for I am satisfied the land is not subject in any view that may be taken of the case, unless there was fraud in the transaction, which is not pretended.  If the verdict is right upon all the facts and law of the case, a new trial will not be granted, although the charge of the Court may be erroneous upon some of the points involved: 41 *Georgia*, 675; 42 *Ibid.*, 244, 587; 33 *Ibid.*, 207, 173.

Judgment affirmed.

McCAY, Judge, concurring.

As to the dormancy of the judgment, I have stated my views fully in *Battle vs. Shivers*, 39 *Georgia*, 405, and I am satisfied with what I then said.  It seems to me that all this effort to pervert the words "statute of limitations" in the Act of 1860, so as to make them include the Dormant Judgment Act, is an after-thought to which men's minds come in their efforts to save judgments from that neglect which, du-

ring the war, attended all business. Men have suffered and do suffer, from that neglect in other matters, and if they suffer also because of their neglect to attend to the preservation of their liens, I feel no disposition to aid them to the injury of purchasers and younger liens. As I said in *Battle vs. Shivers,* the Dormant Judgment Act is an Act, the intent of which is to require notice of a judgment lien to be given upon the public records, once in seven years, that the plaintiff still claims his judgment to be a subsisting one. And there is nothing in the Act of 1860, nor in the circumstances of the war, to excuse a man from giving a notice, if the effect of his failure has been to mislead purchasers and allow younger liens to vest. True, it is a misfortune to the plaintiff, but it is better that he should suffer than that others, who have acted from ignorance, caused by his fault, should make way for him. The Act of 1856, in so far as it declares the judgment presumed to be satisfied, so that it cannot be sued upon or revived after the seven years, (if the Act is to have that construction, which I am not sure of,) may be a statute of limitations, and may have been suspended. But if this be its meaning, its suspension, in my judgment, leaves the Act of 1823 in full force. Whilst the Act of 1856 was in operation, it protected purchasers and junior liens without any necessity of a resort to the Act of 1823. If the judgment was dead, satisfied as to the defendant, purchasers and younger liens were protected under the protection of the defendant. But when by this suspension there ceased to be any protection to the defendant, the Act of 1823, protecting purchasers and younger liens, (which was not a statute of limitations, but, as I contend, was an Act the object of which was to regulate the rights of third persons against the property of the debtor,) was left in full force. Our law now requires mortgages to be recorded in three months, to make them notice to third persons. If we were to adopt a law making them *void* if not recorded, this, while it was of force, would protect purchasers as well as mortgagors, and the present law would be of no practical use; but if the new law should be suspended, the present law

would still be of force and be of practical operation, for the simple reason that the present law has a special purpose, to-wit: to give notice. The new law would have another purpose, to-wit: to affect the mortgager, and the suspension of the new law would leave the old standing in full operation, not because it revived the old law, for that was not repealed, or even superseded by the new, but because the removal of the new protection left the old to operate.

On the other point in this record, I adhere to the decision of *Chapman vs. Aiken.* I did not in that case give my reasons for concurring. The great mistake that is made by those who treat this Act and the Dormant Judgment Act as statutes of limitation is, they forget that the questions are not between the plaintiff and defendant, but between the plaintiff and *third persons*, and that both of these Acts have for their object the protection of purchasers. By our law, a judgment, from the date of its rendition, is a lien on all the property of the defendant wherever it may be found in the State. It has its iron heel so surely planted that whoever, within the limits of the State, buys land of the defendant, is charged with notice of the judgment and buys subject to it, with the single condition that this lien, if the purchaser goes into possession, ceases in four years. Statutes of limitation are *always* based upon the idea that the party barred by them has delayed action so long that the presumption arises that his claim is satisfied, or that by the death or disappearances of witnesses, or loss of papers, the defendant has lost his evidence. Hence, if the plaintiff be under disability, as nonage, coverture, imprisonment, etc., the statutes almost uniformly except him from their operation, or if the defendant has acknowledged the debt, or recognized the title, the statutes only run from the acknowledgment.

This Act is based on different principles. The plaintiff's judgment is matter of record—when satisfied, the record shows it. It may lose its lien, though unsatisfied. The ground of the protection intended for the purchaser is, that the plaintiff is in fault for having failed to make his money out of the de-

fendant. Ordinarily the defendant has other property. A man rarely sells *all* he has. And the language of the law is not that "your debt is satisfied," but that you have failed, when you had it in your power, to make your money out of the defendant. You have stood by four years, seen this purchaser in possession, allowed him, perhaps to improve this property, and having done so, you are rightly barred. But there is, I think, a stronger view of it than this. The purchaser is bound to take notice of the judgment. He cannot plead ignorance. The judgment is a record, and the world must notice it. Every man, therefore, who buys with the lien, has an inevitable burden on his title for four years. He takes the risk that the defendant will pay, or that the plaintiff will make the money out of other property, and he has generally a warranty from his vendor that this will occur. But he buys with this distinct understanding that at any time within four years his land may be levied on, and with the additional understanding that if four years elapse, his land shall be free. It makes no difference whether the plaintiff be under disability or not, nor does it make any difference if, on the very last day of the four years, the lien be *recognized*. Indeed, for four years the lien is inevitable, recognized or not. The purchaser might recognize it, and it would be no stronger. He might repudiate it, and it would be no weaker. But on the very day after the four years is up, the lien is gone. It cannot be recognized after that, even by a written acknowledgment that he bought the land after the date of the judgment, and that the judgment is still unpaid.

For these reasons I think this Act is not a statute of limitations, but that its scope and meaning is to say that the lien exists against defendant's land going into the hands of purchasers, upon *condition* that the lien is asserted in four years, and that the purchaser buys the land subject to the lien, provided it is enforced in four years. It stands on precisely the same footing as did the right of action to the representative of Lacy in the case, decided at this term, of *The Selma, Rome and Dalton Railroad Company vs. Lacy.*

There the Code of Alabama had provided that the representative of one who had been tortiously killed, might, within twelve months, maintain an action for damages against the wrongdoer. A suit was brought in this State on the statute. By the general rule of law the statute of limitations of the place of trial regulates the right of the parties to sue. Our statute of limitations for torts is two years. But this Court unanimously held that the suit must be brought within twelve months, because *it was upon that condition* that the right of · action was given by the law of Alabama. The Chief Justice even holding that the declaration (which was seriously defective when brought, so that no right of action was set forth) could not even be amended after twelve months, and this, though by our statute of limitations, the plaintiff has two years to sue for such a tort.

But under the facts of this case, as they appear without question in the record, I am of the opinion, with my brother TRIPPE, that the defendant in this *fi. fa.* never had such an interest in this land as was the subject of levy and sale, as the plaintiff has undertaken to levy and sell it. By the law of England, an imperfect equity could not be levied upon by a common law *fi. fa.* The law only recognized legal titles, or such perfect equities as the statute of frauds made the subject of levy and sale, or the statute of uses executed. Hence, even an equity of redemption in the mortgagor was not subject to an execution at law. And it was a general rule, that where the interest of the defendant was one cognizable only in a Court of equity, a judgment at law was not a lien upon it, and could not sell it: 2 Lewin on Trusts, 665; see, also, Doe *vs.* Greenhill, 4 B. & A., 684; Harris *vs.* Baker, 4 Bingham, 96; Haynes *vs.* Baker, 5 Ohio, 253; Tyree *vs.* Williams, 3 Bibb, 366; January *vs.* Bradford, 4 Bibb, 566. Nor did our law, prior to the Code, make any change in this rule in principle. A mortgage, it is true, was considered even at law only as a security, and not a title, so that the interest of the mortgagor was treated as a *legal* interest, and not simply an equitable one, so that it became, logically, subject to levy and sale under a

judgment against the mortgagor. But this Court has on several occasions ruled that an equitable interest was not bound by a judgment at law, unless that interest was what is called a perfect equity. In the latter case it was made subject by the statute of frauds, even in England, and as a matter of course it became so here, by the statute adopting the statute and common law of England: *Pitts vs. Bullard,* 3 *Georgia,* 5. In *Hammock vs. Myrick,* 14 *Georgia,* 77, this Court held that the interest of the drawer of land, before the grant issued, is not subject to levy and sale.

In *Dandle vs. Neal,* 10 *Georgia,* 148, the land had been sold as the property of Whitehurst and bid off by Pou. Subsequently Pou agreed with Whitehurst that he might have back the land by paying him back the amount of his purchase, $1,200 00. Whitehurst paid about $900 00. They then made a new agreement, by which, in effect, Pou sold the land to Geddings, the parties revoking the first contract with Whitehurst. This Court held the property not subject to an execution against Whitehurst existing at the time the $900 00 was paid, and the Court say, page 157, "By the leading case (Pitts and Bullard,) the contract must be executed, nothing must remain to be done, before the purchaser can acquire a title, so as to make it liable at law to an execution. He must pay down *the entire consideration.* At any time before this is done, the parties may come together and annul or vary their contract." The case of *Ware vs. Jackson,* 19 *Georgia,* 452, and *McGregor vs. Mathis,* 32 *Georgia,* 417, go on this same idea. In the former case, land bargained by A to B before the judgment, A retaining the title and giving B a bond for titles, was held subject to a judgment against A, obtained before *all* the purchase money was paid. In 32 *Georgia,* 417, the land was held not subject to a judgment against the vendor who retained the title, but who transferred without recourse the vendee's note. In all these cases the question turned on who had the legal title. The general rule being that the land is subject to a judgment against the holder of the legal *paper* title, but if that be a mere naked title, and the beneficial in-

Akin *vs.* Freeman.

terest be entirely in another, then it is subject to an execution against that action. Such, as I understand it, is the settled rule as to the lien of a judgment at law upon an equitable interest in land. Under the Code, the vendor may, if the purchase money be unpaid, file a deed in the clerk's office and then levy: Irwin's Code, 3604. If one who is not the vendor desires to subject to his judgment land partly paid for, he must levy on the land, the whole title, and give the maker of the bond notice. The whole title is sold, the vendor getting the preference for his unpaid purchase money: Irwin's Code, section 3528. But both these provisions recognize the position now assumed. The sale in both cases is of the legal title. Section 3228 is a substitute for the right the judgment creditor had to go into equity, pay the balance of the purchase money and have the land sold.

Under this view of the law, it is my judgment that there never has been anything in the defendant in execution in this land subject to levy and sale. When he sold to the claimant, he had only a bond for titles, and had paid none of the purchase money. True, he had improved the property, and equity would have authorized the plaintiff to file a bill, tender Shorter his money and sell the land. But at law, the defendant in the judgment had no leviable interest. He sold this interest to the claimant. It was the claimant who paid Shorter, and at the time of the sale it was agreed that the claimant should have a transfer of Shorter's bond. When Shorter was paid, he held the legal title. For whom? According to the testimony of claimant, for him. But even supposing that claimant took defendant's bond for titles, and relied on that, Shorter would have the legal title in trust for claimant and defendant. The defendant would not even then have a perfect equity, for the claimant's equity had come in before Shorter was paid.

In any view of it, as it seems to me, the right of defendant was not covered by the lien of the judgment. Certainly it is not so clearly so as to justify the pushing of its technical, rigid lien, so as to defeat the *bona fide* rights of the claimant.

About the facts in the case there is no dispute, and if the judgment were to be reversed, on the error of the Court, the verdict must be the same.

WARNER, Chief Justice, dissenting.

This was a claim case. The plaintiff had his execution levied on a tract of land as the property of Rice, the defendant therein, which was claimed by Freeman, who claimed to have been in possession of the land for four years as a *bona fide* purchaser thereof from the defendant in execution, for a valuable consideration, and that the land was discharged from the lien of the judgment under the 3525th section of the Code. On the trial of the case it appeared that the plaintiff's judgment was obtained 22d November, 1858—execution issued thereon 6th December, 1858, and was levied on the land 31st May, 1867. Whether the claimant went into the possession of the land in 1860, at the time of his purchase, or in March, 1862, when he made the last payment for it, and obtained his deed from Rice, the evidence is not clear. The claimant states that he bought the land in good faith, and paid for it, and by himself and tenants, had been in possession of it ever since. There was considerable evidence as to the manner in which the claimant paid for the land and procured his title.

The plaintiff in execution requested the Court to charge the jury that the several statutes of this State limiting the time within which judgment liens should be enforced, were statutes of limitation, and were suspended during the war by the several Acts of the Legislature, enacted for that purpose, which the Court refused, but, on the contrary thereof, charged the jury: " If seven years had run against this *fi. fa.* without proper entries during that time, it would be dormant, and could not bind the land." The Court also charged the jury, that: " If Freeman was a *bona fide* purchaser for value, without actual notice of this judgment, and held possession of this land for four years prior to the levy, the land in his hands is discharged from the lien of the judgment, even if it is not

Akin *vs.* Freeman.

dormant." In my judgment, the Court erred in not charging the jury as requested, and in the charge as given, in view of the facts of this case, for the reasons stated in my dissenting opinion in the case of *Chapman vs. Aiken,* 39 *Georgia Reports,* 353.

By refusing to charge as requested, and in the charge as given to the jury, they were compelled to find that the plaintiff's *fi. fa.* was *dormant,* and could not bind the land; for seven years had run from its date up to the time of the levy on the land, unless the running of the statute of limitations applicable to it had been suspended during the war; and the same remark may be made as to the claimant's four years' possession. If the plaintiff's execution was dormant at the time it was levied on the land, as the jury were bound to find under the charge of the Court, then the plaintiff had no case, and it was not necessary for them to consider any of the other evidence offered by the defendant, and the fair legal presumption is that they did not do so. But it said there was sufficient evidence offered by the claimant to have *required* the jury to have found a verdict in his favor, although the jury did not pass upon that evidence under the charge of the Court as to the plaintiff's *fi. fa.* being dormant, and not having any lien on the land. Whether the jury would have found in favor of the claimant upon the evidence offered by him, if the charge of the Court had not made it necessary for them to consider it, this Court cannot know. In my judgment, that evidence falls very far short of being such as would have *required* them to have done so. It is quite clear, however, that the jury, under the charge of the Court, did not consider or pass upon it. I am therefore of the opinion that the judgment of the Court below should be reversed.